UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:09-CV-322-F

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| JACKIE DOBSON PRITCHETT, | ) | |
| TONY EDWIN PRITCHETT, SR., | ) | |
| TONY EDWIN PRITCHETT, JR., | ) | |
| and IMAGE FINANCIAL, LLC, d/b/a | ) | |
| C&S FINANCIAL, IMAGE, | ) | |
| IMAGE COMMUNICATIONS, | ) | |
| IMAGE MARKETING, IMAGE | ) | |
| COMMUNICATION/MARKETING, | ) | |
| IMAGE COMMUNICATION | ) | |
| MARKETING | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the Government's Motion for Summary Judgment [DE-65] and the Defendants' Motion to Extend Time to File Their Memorandum in Opposition to Plaintiff's Motion for Summary Judgment [DE-95].

## I. BACKGROUND

On December 8, 2003, Jackie Dobson Pritchett (hereinafter "Jackie") pleaded guilty to a criminal information charging her with one court of conspiracy to commit wire fraud, mail fraud and securities fraud in violation of 18 U.S.C. § 371. On April 26, 2004, Jackie was sentenced to a 57-month term of imprisonment, and was ordered to pay restitution in the amount of $721,330.00, jointly and severally with her co-defendant, James Charles Reives.

On July 15, 2009, the Government filed the present action pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. §§ 3001 *et seq.*, against the following defendants: Jackie; her husband Tony Edwin Pritchett, Sr. ("Tony, Sr."); her son, Tony Edwin Pritchett, Jr. ("Tony, Jr."), and Image Financial, LLC. The Government specifically alleges in Count I that Jackie's July 21, 2003, transfer of her interest in real property located at 1968 Turniptown Road, Ellijay, Georgia, 30535, ("Turniptown Road Property") to Tony, Sr., was a fraudulent transfer under 28 U.S.C. § 3304(b). In Count II, the Government alleges that a constructive trust should be imposed on the real and personal property located at the Turniptown Road Property in favor of Government. In Count III, the Government alleges that the house and pool at the Turniptown Road Property were paid for with some of the proceeds from Jackie's criminal acts, and therefore Jackie and Tony, Sr., were unjustly enriched by the receipt of mortgage proceeds on the Turniptown Road Property. In Count IV, the Government alleges that Tony, Jr., and Tony, Sr., are both member-managers of Image Financial, LLC, and that Tony, Jr., Tony, Sr., and Image Financial, LLC, each received income and/or payment of expenses as a benefit of Jackie's criminal actions. The Government alleges that Jackie's transfers to Image Financial constitute fraudulent transfers. In Count V, the Government asks that a constructive trust be imposed against Image Financial, Tony, Jr., and Tony, Sr., in an amount equal to the money received by each defendant, or the increase in the value of the business of Image Financial. Finally, in Count VI, the Government alleges, in the alternative, that Jackie was part-owner of Image Financial, and that the transfer of her ownership interest to either Tony, Sr., Tony, Jr., or both, was fraudulent.

2

## II. FACTS

The facts, in the light most favorable to Defendants, are as follows:

### A. Jackie's involvement with Tri-Star

It is undisputed that the criminal scheme engaged in by Jackie, and her criminal co-defendants, was a "Ponzi" scheme in which investors were solicited, but not paid. *See United States v. Reives*, 5:03-CR-314-F, Criminal Information filed Nov. 5, 2003 (at DE-1). The scheme was perpetuated, in large part, through an entity called Tri-Star Investment Group, LLC ("Tri-Star"). Jackie was employed as the office manager for Tri-Star from around February 1998 until December 2000 when Tri-Star was shut down. Through her employment at Tri-Star, she earned approximately $700.00 to $2,500.00 a week. As the criminal scheme progressed, she earned bonuses, which ranged from $10,000.00 to $25,000.00 and more.

### B. Turniptown Road Property

In 1999, Jackie and her husband built a five-bedroom home, totaling approximately 4000 square feet, and a pool at the Turniptown Road Property. Prior to this time, Jackie and her family resided in a mobile home on a nearby lot of land on Turniptown Road. Permits from the time the home was being built list Jackie and Tony, Sr., as the owners of the home. "Southern Pride Homes" and "Jack Barger" are listed as the contractor and/or builder on the various permits.

When Jackie was sentenced in 2004, she prepared an affidavit that appears to detail her expenditures from 1999-2000. Included in this affidavit was a listing of expenditures towards the construction of the home and pool at the Turniptown Road Property, totaling $245,500.00. Jackie also told the FBI in 2000 that she used some of the "bonus" funds from Tri-Star to pay off

3

the mortgage of her house.[1]  In her May 2010 deposition, however, Jackie testified that she contributed "some" money to the construction of the Turniptown Road Property, but the majority of the money came from Tony, Sr.'s aunt, Ruby Pritchett. According to Jackie's testimony, Ruby gave Tony, Sr., money via a 1993 agreement. Ruby allegedly kept the money she gave to Tony, Sr., under her bed. Tony, Sr., in his May 2010 deposition, similarly testified that Ruby "fronted" him the money for building the Turniptown Road property. He explained in his testimony that Ruby "fronted" him this money because she had a life estate in the property, so she would live with his family in the house when it was completed. Tony, Sr., also testified that he built the house himself with the help of day laborers. He could not recall the names of any of "day laborers" or other subcontractors he employed to build the house or pool.

## C. Transfer of Turniptown Road Property

In 2002, Tony Sr., transferred his interest in the Turniptown Road Property to both Jackie and himself via a Joint Tenancy with Survivorship Warranty Deed. Tony, Sr., testified that this transfer was the result of an attorney who "goofed up" while doing a refinancing of the property. On July 21, 2003, Jackie transferred her interest in the Turniptown Road Property to Tony, Sr., via a Quit Claim Deed.

---

[1] The Government suggests that there was no mortgage on the Turniptown Road Property until 2002. *See* Mem. in Support of Mot. for Summ. J. [DE-66] at p. 15 ("A mortgage on 1968 Turniptown does not appear of record until December, 2002, which is after [Jackie] learns of the FBI investigation into Tri-Star."); Decl. of Margaret M. Davis [DE-69-1] at ¶ 23 ("There was no mortgage loan on the residence until December, 2002."). The report from the FBI interview is unclear as to whether Jackie was referring to a mortgage on the Turniptown Road Property or another property.

4

**D. Jackie's Other Expenditures**

The affidavit Jackie submitted in connection with her sentencing shows that she spent $39,000.00 on household furnishings. The affidavit also indicates that she spent $23,760.00 on "utilities" which included insurances and taxes.

Jackie also lists "expenditures" in the amount of $44,500.00 for vacations from 1999-2000. According to the affidavit, she also purchased seven vehicles for a total amount of $138,000.00.

**E. Refinancing of Turniptown Road Property**

On December 31, 2002, a mortgage loan in the amount of $217,000.00, secured by the Turniptown Road Property, was recorded in the Gilmer County, Georgia registry. The borrowers were listed as Jackie and Tony, Sr. Prior to this date, there was no mortgage loan on the residence. Thereafter, a mortgage loan in the amount of $308,000.00, secured by the Turniptown Road Property, was recorded on July 31, 2003. Jackie has indicated that after the previous mortgage was paid off, she and Tony, Sr., received net proceeds in the amount of $71,580.08.

After Jackie was incarcerated, Tony, Sr., refinanced the mortgage in 2005 and again in 2007.

**F. Image Financial, LLC**

Image Financial, LLC, is a limited liability company which was organized under the laws of Georgia on November 15, 1999. The Operating Agreement for the Image Financial provides that Tony, Sr., owns 75% of the company, and Tony, Jr., owns 25% of the company. At the time Image Financial was formed, Tony, Jr., was 16 years old.

5

In connection with the mortgage application Jackie and Tony, Sr., submitted in December, 2002, Jackie listed herself as the owner of "Image Communication Marketing." A handwritten note faxed to Lendmark suggests that Jackie and Tony, Sr., operated the legal entity Image Financial, LLC, under the following "doing business as" names: C&S Financial; Image Communication, and Image Marketing. Additionally, at the closing of the December 2002 refinance, $10,255.14 was paid to Cingular for the benefit of Image Financial, LLC.

## III. MOTION TO EXTEND TIME

### A. Relevant Procedural History

The Government filed the Motion for Summary Judgment on October 18, 2010. Under the applicable rules, any response to the Government's motion for summary judgment was due on November 11, 2010. No response was filed by that date.

On December 1, 2010, the Clerk of Court submitted the Government's Motion for Summary Judgment to the undersigned. Over a week later, on December 9, 2010–and almost a month after a response was due to the motion for summary judgment–Defendants filed a memorandum in opposition to the motion for summary judgment [DE-75]. On December 10, 2010, Defendants filed numerous exhibits in support of their memorandum. Defendants failed, however, to file a motion for leave to extend the time for filing their response. Indeed, Defendants did not acknowledge the untimely nature of their filings.

Consequently, in an order filed on December 14, 2010, the court ordered Defendants to file, within seven days, a motion to extend time to file their memorandum in opposition, pursuant to Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure. The court expressly warned

6

Defendants that the failure to timely file the motion, or the failure to demonstrate "excusable neglect" would result in the court's refusal to consider their untimely memorandum and supporting exhibits.

On December 21, 2010, Defendants filed their Motion to Extend Time to File Their Memorandum in Opposition to Plaintiff's Motion for Summary Judgment [DE-95]. The Government filed its response in opposition [DE-96].

**B. Analysis**

Where, as here, a motion for extension of time is filed after a deadline has expired, the provisions of Rule 6(b)(1) of the Federal Rules of Civil Procedure require a demonstration that the failure to act within the time required was the result of "excusable neglect." FED. R. CIV. P. 6(b)(1)(B). "Although inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect, it is clear that 'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Pioneer Invs. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 392 (1993)(footnote omitted). The determination of whether neglect is excusable "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission" which includes "the danger of prejudice to the [other party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.* at 395. "The most important factor is the third–the reason for the delay." *Colony Apartments v. Abacus Project Mgmt, Inc.*, 197 Fed. Appx. 217, 223 (4th Cir. Md. 2006)(citing *Thompson v.*

7

*E.I. DuPont De Nemours & Co.*, 76 F.3d 530, 534 (4th Cir. 1996)). "Merely establishing these elements does not entitle a party to relief; rather, 'whether to grant an enlargement of time still remains committed to the discretion of the district court." *Id.* (quoting *Thompson*, 76 F.3d at 532 n. 2).

Here, although Defendants' delay is not likely to be unduly prejudicial to the Government, the other factors this court must consider weigh against making a finding that Defendants have demonstrated excusable neglect. Specifically, Defendants' response was overdue by almost a month. It is difficult for the court to perceive how merely miscalculating the deadline results in such a tardy filing, especially where Defendants do not point to any ambiguity in the applicable rules. *See Lewis v. School Dist. No. 70*, 523 F.3d 730, 740 (7th Cir. 2008)(explaining that "a plausible misinterpretation of a[n ambiguous] procedural rule" may give way to a finding of excusable neglect, but an inexplicable failure to read or follow clear rules does not). Accordingly, because of the length of the delay in the filing, and because of the lack of a plausible reason for the delay, Defendants' Motion to Extend Time to File Their Memorandum in Opposition to Plaintiff's Motion for Summary Judgment [DE-95] is DENIED.

Although the court will not consider Defendants' Memorandum in Opposition to the Motion for Summary Judgment [DE-75], the court *will* consider the following exhibits attached to the Memorandum: Excerpts from the Deposition of Jackie Pritchett [DE-76-1] and Excerpts of Deposition of Tony E. Pritchett, Sr. [DE-78-1]. The undersigned's stated practice preference is that "[i]f deposition transcripts will be referenced in memoranda, Judge Fox prefers having the full condensed transcript available." *See* The Honorable James C. Fox, Practice Preferences, available at http://www.nced.uscourts.gov/html/judges.htm. Because the Government references

8

the depositions of both Jackie and Tony, Sr., in its Memorandum in support of its motion for summary judgment, but neglected to provide the court with a full transcript of either deposition, the court will consider the additional pages provided by Defendants.

## IV. MOTION FOR SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When a party has failed to respond to a summary judgment motion, the court may grant summary judgment only "if appropriate." FED. R. CIV. P. 56(e)(2). To determine if it is appropriate, the district court must review the record to determine whether the movant is entitled to summary judgment. *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). ("Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to 'a judgment as a matter of law.' "). Consequently, although the court will not consider Defendants' response to the Government's motion for

9

summary judgment, it still will review the record to determine whether (1) there is no genuine issue of material fact, and (2) the Government is entitled to judgment as a matter of law.

## V. MOTION FOR SUMMARY JUDGMENT ANALYSIS

In its motion for summary judgment, the Government does not specify on which of the six claims alleged in the Complaint it moves for summary judgment. Based on its arguments in the memorandum supporting its motion for summary judgment, the court perceives that the Government is moving for judgment on its first claim–fraudulent transfer of the Turniptown Road property under the FDCPA–and its fourth and fifth claims, for fraudulent transfers to Image Financial, LLC, and a constructive trust against Image Financial, LLC. The court will examine each claim in turn.

### A. Fraudulent transfer of Turniptown Road

With regard to its first claim, the Government explains that it

has three theories of fraudulent conveyances regarding the 1968 Turniptown [Road] [P]roperty for which is seeks a remedy. First, the transfer from the Defendant of the ill gotten Tri-Star gains to build the house and pool in 1999; second, the transfer of the 1968 Turniptown [Road] [P]roperty out of her name and Tony Sr.'s into just Tony Sr.'s in 2003; and the repeated the siphoning of equity from the property from 2002 to 2007, by Tony, Sr. and [Jackie].

Mem. in Support of Mot. for Summ. J. [DE-66] at p. 10. The Government argues that under any of its theories, judgment is appropriate under 28 U.S.C. § 3304(b).

Section 3304(b) provides, in pertinent part:

(b) Transfers without regard to date of judgment.
(1) Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises

10

before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation–

    (A) with actual intent to hinder, delay or defraud a creditor; or

    (B) without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor–

        (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

        (ii) intended to incur, or believe or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

(2) In determining actual intent under paragraph (1), consideration may be given, among other factors, to whether–

    (A) the transfer or obligation was to an insider;

    (B) the debtor retained possession or control of the property transferred after the transfer;

    (C) the transfer or obligation was disclosed or concealed;

    (D) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    (E) the transfer was of substantially all the debtor's assets;

    (F) the debtor absconded;

    (G) the debtor removed or concealed assets;

    (H) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

    (I) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

    (J) the transfer occurred shortly before or after a substantial debt was incurred; and

    (K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

28 U.S.C. § 3304(b). Accordingly, in order to prevail on its claim under § 3304(b), the

Government must show either (1) that the transfer was made "with actual intent to hinder, delay,

or defraud a creditor;" or (2) that the transfer was made without receiving reasonably equivalent

11

value in exchange and that Jackie intended to incur, or believed or reasonably should have believed she would incur, debts beyond her ability to pay as they became due. The Government contends that summary judgment is appropriate under either avenue as to each of its three theories.

### 1. Ill-gotten gains theory

The Government argues that the construction of the house and pool on the Turniptown Road Property, along with the purchase of household furnishings, and the payment of "utilities" associated with the home, all constitute fraudulent transfers under § 3304(b). Additionally, the Government alleges the following *non*-Turniptown Road Property purchases constitute fraudulent transfers:(1) the purchase of $138,000.00 worth of vehicles in 1998 and 1999, (2) the expenditure of $44,500.00 on vacations between 1999-2000, and (3) the expenditures of $32,500.00 on parties, gatherings, and gifts for friends and family.[2]

With little to no analysis, the Government broadly asserts that all of these expenditures—even those that are not related to the Turniptown Road Property—are transfers Jackie made with the actual intent to hinder, delay, or defraud a creditor. The court, however, is not prepared to say as a matter of law at this juncture of the action that the evidence in the record before the court establishes that Jackie's expenditures on the house, pool, utilities, cars, and vacations were all made with the actual intent to hinder, delay or defraud a creditor. *Cf. United States v. Chen*, No. 2:10-CV-00128-PMP-PAL, 2010 WL 5315915 at ** 6-7 (D. Nev. Dec. 20, 2010)(recognizing that "many of the factors" cited in 28 U.S.C. § 3304(b)(2) would allow a

---

[2] Count I–the fraudulent transfer claim– in the Complaint does not mention any of these transfers. Nor do Counts II or III.

finder of fact to find that the debtor acted with the requisite intent, but denying the Government's motion for summary judgment as to certain transfers because the debtors' credibility and intent are questions of fact). Therefore, judgment is inappropriate as to these expenditures under § 3304(b)(1)(A).

Nor can the court state that, as a matter of law, judgment is appropriate under § 3304(b)(1)(B). As noted above, under § 3304(b)(1)(B), a fraudulent transfer may be found where "whether the debtor makes the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation: and the debtor "intended to incur, or believed, or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 28 U.S.C. § 3304(b)(1)(B)(ii). The Government cannot succeed under this avenue, because it does not offer any proof as to the first element: whether Jackie received "reasonable value" when she made the alleged transfers. Indeed, no representation is offered by the Government in its memorandum as to the reasonable value of the home, pool, goods, services, or vacations at the time Jackie made the transfers, let alone citation to evidence in the record. The court, on its own, has observed that the homeowners insurance policy procured by Jackie and Tony, Sr., for the coverage period of August 17, 1999 through August 17, 2000, provided coverage in the amount of $297,600 for the "dwelling" and up to $29,760 for the "dwelling extension." *See* Ex. 9, State Farm Insurance Polices [DE-68-1] at p. 2.[3] Considering

---

[3] An owner's opinion can be evidence as to the value of real property. *See* Evidence as to owner's opinion, admission. *See United States v. Sherrill*, 626 F.Supp.2d 1267, 1270 n.1 (M.D. Ga. 2009)(citing *United States v. 68.94 Acres of Land*, 918 F.2d 389, 397 (3d Cir. 1990)("The Federal Rules of Evidence generally permit landowners to give opinion evidence as to the value of their land due to the special knowledge of property which is presumed to arise out of ownership."); *LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 433 (5th Cir. 1982)("[T]he owner of

13

that Jackie previously stated in the 2004 affidavit that she spent $245,000.00 toward the construction of the home and pool, it does not appear from the record that the construction expenditures were transfers not for reasonably equivalent value.

### 2. Quit-claim deed

The next theory the Government asserts is that Jackie's transfer of her interest in the Turniptown Road Property to Tony, Sr., on July 31, 2003, constitutes a fraudulent transfer under either § 3304(b)(1)(A) or (B). Specifically, the Government explains that Jackie quitclaimed her interest in the Turniptown Road Property approximately four months before she pleaded guilty to the criminal information, while she knew a criminal investigation was ongoing.

Again, the court finds summary judgment inappropriate under § 3304(b)(1)(A). The court does not quarrel with the Government's assertion that one can infer "actual intent" to hinder, delay, or defraud a creditor under the eleven factors set forth in § 3304(b)(2). The problem is, however, for summary judgment to be appropriate, the *only* inference from the factual record must be that Jackie had the actual intent to hinder, delay, or defraud a creditor when she transferred her interest in the property. The court cannot say, as a matter of law, that the only inference is that Jackie transferred her interest in the Turniptown Road Property with the actual intent to hinder, delay, or defraud a creditor.

The court does find, however, that judgment is appropriate under § 3304(b)(1)(B) because there can be no dispute that Jackie did not receive a "reasonably equivalent value" when

---

property if qualified by his ownership alone to testify as to its value.")). The court deems the amount of coverage obtained by Jackie and Tony, Sr., for the Turniptown Road Property is evidence as to their opinion of the value of the property.

she transferred her interest in the Turniptown Road Property, nor is there any dispute that she made the transfer at a time when she "reasonably should have believed [she] would incur debts beyond her ability to pay as they became due." Specifically, the record indicates Jackie received *no* money in consideration for her interest in the Turniptown Road Property, let alone reasonably equivalent value. No excise stamps appear on the quit-claim deed. *See* Compl., Ex. 2 [DE-1-2]. "[V]alue indicated for transfer tax purposes constitutes relevant and admissible evidence of a certain consideration of value." *Gibson v. Dismuke*, 171 Ga. App. 78, 80, 318 S.E.2d 666, 668 (1984). *See also Everett v. Gainer*, 269 N.C. 528, 533, 153 S.E.2d 90, 95 (1967)("[T]he amount of internal revenue stamps, or the absence of internal revenue stamps, is some evidence of the amount of consideration actually paid for the conveyance."); *Burnett v. Burnett*, 122 N.C. App. 712, 715, 471 S.E.2d 649, 652 (1996)(explaining that "no revenue stamps on the deed" indicates a gift). Given the record, it is undisputed that Jackie did not receive reasonably equivalent value, as that term is defined under the FDCPA[4], for her interest in the Turniptown Road Property. *See United States v. Moore*, 156 F.Supp. 2d 238, 246 (D.Conn. 2001)(concluding that "the nominal

---

[4] The FDCPA provides, in pertinent part:

(a) Transaction. Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but Value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

(b) Reasonable Equivalent Value. For the purposes of sections 3304 and 3307, a person gives reasonable equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of such interest upon default under a mortgage, deed of trust, or security agreement.

28 U.S.C. § 3303.

sum of ten dollars is not reasonably equivalent value" for a debtor's interest in his home);

*Vancampen v. United States*, Nos. Civ.A. 95-1436-FGT, Civ.A. 95-1453-FGT, 1997 WL 873537

(D.Kan. July 9, 1997)(finding no dispute that the sum of one dollar did not constitute reasonably

equivalent value for real property ).

Moreover, there can be no dispute that Jackie made the transfer at a time when she

"reasonably should have believed [she] would incur debts beyond her ability to pay as they

became due." Jackie transferred her interest in the Turniptown Road Property approximately

four months before she pleaded guilty to a criminal information, during the midst of an

investigation in which she was actively helping the Government. The record indicates that Jackie

was aware the Government had a strong interest in securing assets for restitution to the over 900

victims of the criminal scheme in which she took part. *See* Transcript of April 26, 2004

Sentencing [DE-66-4] at pp. 13-14 (FBI agent testifies that Jackie was advised that locating

assets was a crucial part of the Government's investigation and she was specifically advised not

to secrete any assets and to divulge her knowledge about the location of her assets). Jackie

reasonably should have believed, at the time, that she would bear some responsibility for the

restitution to the victims of the scheme in an amount that exceeded her ability to pay.

Accordingly, the Government's Motion for Summary Judgment is ALLOWED as to

Jackie's July 21, 2003, transfer of her interest in the Turniptown Road Property.[5]

---

[5] Even if the court, in its discretion, considered Defendants' untimely response to the
motion for summary judgment, the result would be the same. The response *only* addresses
Jackie's actual intent, and does not address the issues of reasonably equivalent value or Jackie's
solvency. Moreover, the fact that Jackie herself may have received her interest in the Turniptown
Road Property as a gift in connection with a refinancing is irrelevant. It does not alter the fact
that, before July 21, 2003, she had an interest in a valuable asset and she transferred that asset for

16

### 3. Mortgages

For the Government's third and final theory regarding its fraudulent transfer claim, it argues that judgment is appropriate against both Jackie and Tony, Sr., because a mortgage obtained on the property in December 2002, and subsequent refinancing of the mortgage on numerous occasions, constitute fraudulent transfers under either § 3304(b)(1)(A) or (B).

Again, the court finds summary judgment inappropriate under § 3304(b)(1)(A). The court cannot say, as a matter of law, that the only inference from the record is that Jackie had the actual intent to hinder, delay, or defraud a creditor when she obtained a mortgage on the Turniptown Road Property in December 2002, and refinanced the mortgage in July 2003. Moreover, the actions of Tony, Sr., of refinancing the mortgage in 2005 and 2007 cannot form the basis of a claim under § 3304(b)(1)(A). The Government has not offered evidence that at the time of the refinancing, Tony, Sr., was a "debtor" within the meaning of the FDCPA.

Similarly, the judgment will not be entered under § 3304(b)(1)(B). There is no evidence tending to show that Jackie failed to receive "reasonably equivalent value" when she obtained the mortgage or later refinanced it. The Government's motion for summary judgment as to its third theory under its fraudulent transfer claim is therefore DENIED.

### B. Transfers to or for the benefit of Image Financial, LLC

In addition to its arguments regarding Jackie's transfers as to the Turniptown Road Property, the Government also argues that "transfers to or for the benefit of Image Financial, LLC, should be set aside; the Defendant should be declared the legal owner of the LLC; or a

---

less that reasonably equivalent value.

constructive trust imposed, against the LLC, in favor of the United States under 28 U.S.C. § 3304." Mem. in Support of Mot. for Summ. J. [DE-66] at p. 17.

### 1. Transfers to or for the benefit of Image Financial, LLC

In Count IV of the Complaint, the Government alleges "Tony Pritchett, Sr., Tony Pritchett, Jr., and Image Financial directly, or indirectly, benefitted from the criminal acts of Jackie Pritchett in that Tony Pritchett, Sr., Tony Pritchett, Jr., and Image Financial, each received income and/or payment of expenses during the time of Jackie Pritchett's criminal enterprise and thereafter." Compl. [DE-1] at ¶ 51. The Government also alleges that the income and benefits received by both Tony, Sr. and Tony, Jr. "from the criminal acts of Jackie Pritchett included, but are not limited to transfers in the nature of financial support and the increase in the value of the business, in which [they] had an interest, Image Financial." *Id.* at ¶¶ 52-53.

The Government elaborates on this claim in the memorandum in support of its Motion for Summary Judgment by asserting "Image Financial LLC would not have been formed on November 15, 1999, for the benefit of Tony, Sr. and Tony, Jr. (who was sixteen in October, 1999), without the salary and bonuses earned by [Jackie] with Tri-Star," noting that in 1999, Tony, Sr., earned only $17,500.00 while employed at Mohawk Carpets. The Government further argues that "Tony, Sr. was able to continue the business of the LLC in 2000, due to the money, in salary and bonuses, that [Jackie] was receiving from Tri-Star." Mem. in Support of Mot. for Summ. J. [DE-66] at p. 18. The Government also notes that in December 2002, at the closing on the mortgage on the Turniptown Road Property, $10,255.14 was paid to Cingular for the benefit of Image Financial.

18

Notably, the Government does not cite to any direct evidence of transfers from Jackie to Image Financial, or to Tony, Sr., or to Tony, Jr., for the benefit of Image Financial, other than the payment of mortgage proceeds to Cingular. Rather, the Government appears to be arguing that the amounts Jackie spent on the Turniptown Road house, bills, vacations, and other expenditures allowed Tony, Sr., to create and then run Image Financial with his own limited financial means. In other words, the Government's arguments as to the "fraudulent transfers" appears to be, for the most part, a repackaging of its arguments with regard the "ill-gotten gains" theory under Count I. As the court stated in its analysis under that count, it is unable to find, as a matter of law, that Jackie's expenditures in 1999-2000 were made with the actual intent to hinder, delay or defraud a creditor. Nor is there any evidence in the record with regard to whether Jackie received a reasonably equivalent value for any of these transfers from 1999-2000.

As the court has noted, however, there is evidence that proceeds from the December 2002 mortgage were disbursed directly to Cingular for the benefit of Image Financial. Both Jackie and Tony, Sr., were joint obligors on the December 2002 mortgage. The court observes that there is no suggestion that Jackie—who at least before this court, at this time, maintains she is not an owner of Image Financial–received "reasonably equivalent value" as defined under the FDCPA in exchange for that transfer of funds which was for the benefit of Image Financial. The court also observes that there is no dispute that Jackie made the transfer at a time when she "reasonably should have believed [she] would incur debts beyond her ability to pay as they became due." The transfer of funds to Cingular, for the benefit of Image Financial, occurred during a governmental investigation in which Jackie played an active role and during which she was informed that the Government was actively trying to secure assets to pay restitution to the victims of the criminal

19

scheme. The fact remains, however, that both Jackie and Tony, Sr., as joint obligors to the

December 2002 mortgage, had rights to the proceeds. It is unclear to the court how their joint

rights to the proceeds affects the analysis of the transfer under § 3304(b). Moreover, even if the

transfer of funds to Cingular can be determined to be fraudulent under § 3304(b), it is unclear to

the court how to fashion an appropriate remedy as to that transfer, given that both Jackie and

Tony, Sr., had rights to the mortgage proceeds. The Government has not addressed either issue

in its Memorandum in Support of the Motion for Summary Judgment. Without any explication

of these issues or citation to persuasive authority, the court will not allow the Government's

Motion for Summary Judgment, even as to the December 2002 transfer of $10,255.14 to

Cingular. This ruling, however, is without prejudice to the Government to file a renewed Motion

for Summary Judgment–*only* as to the December 2002 transfer to Cingular–which includes

analysis of the issues identified by the court and citation to persuasive authority.

### .  2. Legal owner of Image Financial

With no analysis and no citation to authority, the Government argues, in the alternative,

that Jackie should be declared a co-owner of Image Financial. Because the Government has

offered no persuasive analysis as to this alternative request, the court declines to allow the

Government's motion for summary judgment as to that "claim."

### 3. Constructive Trust

Finally, the Government argues, in the alternative, that a constructive trust should be

imposed against Image Financial in favor of the United States.

The North Carolina Supreme Court has explained:

20

> A constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of the title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust . . . . [A] constructive trust is a fiction of equity, brought into operation to prevent unjust enrichment through the breach of some duty or other wrongdoing. It is an obligation or relationship imposed irrespective of the intent with which such party acquired the property, and in a will-high unlimited variety of situations . . . . [T]here is a common, indispensible element in the many types of situations out of which a constructive trust is deemed to arise. This common element is some fraud, breach of duty or other wrongdoing by the holder of the property, or by one under whom he claims . . . .

*Roper v. Edwards*, 323 N.C. 461, 464, 373 S.E.2d 423, 424-25 (1988)(quoting *Wilson v. Development Co.*, 276 N.C. 198, 211-12, 171 S.E.2d 873, 882 (1970)). Although fraud or breach of duty are common circumstances giving rise to the imposition of a constructive trust, neither are required. "Inequitable conduct short of actual fraud will give rise to a constructive trust where retention of the property by the holder of the legal title would result in his unjust enrichment." *Id.* (internal quotation marks and citation omitted).

The Government, again, offers very little analysis with regard to its request that the court impose a constructive trust against Image Financial. It asserts:

> The insiders, family members, in this case had a fiduciary duty not to divert funds to another, [Jackie], and to fail to disclose such transfers to the benefit of [Jackie]. [Jackie] initially, through her salary and her bonuses at Tri-STar, enabled [Image Financial] to be formed, then used various bank accounts as her own, along with Tony, Sr., and Tony, Jr.

Mem. in Support of Mot. for Summ. J. [DE-66] at p. 20. Again, the crux of this alternative claim appears to rest upon the Government's ill-gotten gains theory: the existence of Image Financial

would not have been possible without, at the very least, the indirect financial support of Jackie. For the reasons already stated by this court, summary judgment is inappropriate as to this theory.

## C. Remedies

This court has concluded that summary judgment is appropriate as to the Count I, in as much as it applies to Jackie's July 2003 transfer of her interest in the Turniptown Road Property

Upon showing that a transfer is fraudulent, the Government may avoid the transfer to the extent necessary to satisfy the debt to the Government, and may obtain a remedy "against the asset transferred or other property of the transferee," or "any other relief the circumstances may require." 28 U.S.C. § 3306(a). If the transfer is voidable under § 3306(a), then the the Government "may recover judgment for the value of the asset transferred, but not to exceed the judgment on a debt." 28 U.S.C. § 3307(b). The judgment may be entered against "(1) the first transferee of the asset or the person for whose benefit the transfer was made; or (2) any subsequent transferee, other than a good faith transferee who took for value or any subsequent transferee of such good-faith transferee." 28 U.S.C. § 3307(b).

In this case, the court finds that the July 2003 quitclaim deed transferring her interest in the Turniptown Road Property to Tony, Sr., shall be set aside. The Court also finds that the Government shall be permitted to record a judgment lien attaching Jackie's half interest in the Turniptown Road Property and to execute on that lien if necessary. *United States v. Sherrill*, 626 F.Supp.2d 1267, 1275 (M.D. Ga. 2009). "The foregoing remedies, however do not effectively 'undo the fraud' " because subsequent to the July 2003 transfer, Tony, Sr. "obtained additional financing which increased the amount of the encumbrances on the property." *Id.* Consequently,

22

Jackie's interest in the Turniptown Road Property has a lower value today after the conveyance is set aside than it had prior to the July 2003 transfer. Faced with a similar situation, the court in *Sherrill* determined that the only way to effectively "undo the fraud" was to award damages to the Government and against the transferee equal to the value of the debtor's interest in the equity of the property at the time of the fraudulent transfer. *Id.* This court agrees.

Here, the evidence before the court is that at the time of the July 2003, transfer, the dwelling and dwelling extension was insured for $321,900 and $32,190, respectively, for a total insured value of $354,090.00. *See* Ex. 9, State Farm Insurance Polices [DE-68-1] at p. 8. At the time of the transfer, a secured loan existed on the Turniptown Road Property, but it is unclear to the court the outstanding balance on the loan at the time of Jackie's transfer. Without clear evidence, this court cannot determine Jackie's interest in the equity in the Turniptown Road Property to enter a money judgment against Tony, Sr. Accordingly, the Government is ORDERED to file, within 14 days of the filing date of this order, evidence of the remaining balance on the December 2002 mortgage at the time of Jackie's July 2003 transfer of her interest in the Turniptown Road Property.

**D. Remaining Claims**

Finally, this court has observed that the Government did not specify on which of the sixth claims alleged in the Complaint it moved for summary judgment. As detailed in this order, the court interpreted the motion as applying to the Government's first, fourth, and fifth claims. The Government offered alternate theories as to the first and fourth claim, one of which was successful. Given that there are several claims remaining in this case, the Government is

23

ORDERED to file a notice, within fourteen days of the filing date of this order, indicating whether it intends to proceed to trial on the remaining claims.

## VI. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Extend Time to File Their Memorandum in Opposition to Plaintiff's Motion for Summary Judgment [DE-95] is DENIED. The Government's Motion for Summary Judgment [DE-65] is ALLOWED in part. Specifically, the Motion is ALLOWED on Count I, to the extent it applies to Jackie's July 2003 transfer of her interest in the Turniptown Road Property. The motion is DENIED in all other respects; however, the Government may file, within fourteen days of the filing date of this order, a renewed Motion for Summary Judgment as to only the December 2002 transfer of $10,255.14 to Cingular, provided the renewed motion includes analysis of the issues identified by the court in this order and citation to persuasive authority.

Furthermore, the Government is ORDERED to file, within fourteen days of the filing date of this Order, evidence of the remaining balance on the December 2002 mortgage at the time of Jackie's July 2003 transfer of her interest in the Turniptown Road Property. The court will direct the Clerk of Court to enter judgment accordingly after the receipt of the Government's filing.

Finally, the Government is ORDERED to file a notice, within fourteen days of the filing date of this order, indicating whether it intends to proceed to trial on the remaining claims.

24

SO ORDERED.

This the _20_ th day of January, 2011.

James C. Fox

James C. Fox

Senior United States District Judge